**26-1863**

# United States Court of Appeals for the Eighth Circuit

ABBVIE, INC., A DELAWARE CORPORATION, ET AL.,
*Plaintiffs-Appellees,*

ASTRAZENECA PHARMACEUTICALS, LP,
*Plaintiff,*

v.

DREW H. WRIGLEY, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF NORTH DAKOTA, ET AL.,
*Defendants-Appellants,*

AMERICAN HOSPITAL ASSOCIATION, ET AL.,
*Amici on Behalf of Appellants.*

On Appeal from the United States District Court for the District of North Dakota, No. 1:25-cv-81, Judge Daniel M. Traynor

**Response Brief of AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC**


Meredith M. Pohl
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 900
Washington, DC 20006
(202) 737-0500
mpohl@kslaw.com

Matthew S. Owen
Russell B. Balikian
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500
mowen@gibsondunn.com
rbalikian@gibsondunn.com

*Counsel for Plaintiffs-Appellees*

## SUMMARY OF THE CASE

Section 340B of the Public Health Service Act, 42 U.S.C. § 256b, requires drug manufacturers to offer drugs to certain health-care providers at steep discounts—often literal penny prices—as a condition of participation in Medicaid and Medicare Part B. Federal law permits manufacturers to attach conditions to these 340B offers, and manufacturers do so to prevent duplicate discounts and the diversion of 340B drugs to ineligible patients. Some states have enacted their own laws regulating 340B transactions. This Court upheld Arkansas's and Missouri's 340B laws because it construed them to regulate only "delivery of 340B drugs," as to which 340B "is silent." *Novartis Pharms. Corp. v. Hanaway*, 180 F.4th 1097, 1113 (8th Cir. 2026); *see PhRMA v. McClain*, 95 F.4th 1136, 1143-45 (8th Cir. 2024). North Dakota's H.B. 1473 is different. It undisputedly applies *before* the 340B sale to *criminalize* conditions on 340B offers that federal law allows. AbbVie, Inc. and its affiliates (AbbVie) sued to enjoin H.B. 1473, as did other manufacturers. The district court correctly held H.B. 1473 unconstitutional.

AbbVie respectfully requests 20 minutes of argument given the number and importance of the issues in these consolidated appeals.

## CORPORATE DISCLOSURE STATEMENT

By and through undersigned counsel, AbbVie certifies that Allergan, Inc. is 100% owned by Allergan Finance, LLC; Durata Therapeutics, Inc. is 100% owned by Allergan W.C. Holding Inc.; AbbVie Products LLC is 100% owned by AbbVie Inc.; Pharmacyclics LLC is 100% owned by AbbVie Inc.; Allergan Sales, LLC is 51.8% owned by Allergan Holdings, Inc. and 48.2% owned by Allergan Holdco US, Inc.; and AbbVie Inc. is the ultimate parent of each of the other aforementioned companies. No publicly held corporation owns 10% or more of AbbVie Inc.'s stock.

**TABLE OF CONTENTS**

SUMMARY OF THE CASE .......... i
CORPORATE DISCLOSURE STATEMENT .......... ii
TABLE OF CONTENTS .......... iii
TABLE OF AUTHORITIES .......... v
STATEMENT OF ISSUES .......... 1
INTRODUCTION .......... 2
STATEMENT OF THE CASE .......... 8
A. The 340B Pricing Program. .......... 8
B. Contract Pharmacies And The Replenishment Model. .......... 11
C. Manufacturers' Contract-Pharmacy Policies .......... 16
D. The North Dakota Law. .......... 20
E. The North Dakota Litigation. .......... 23
SUMMARY OF ARGUMENT .......... 25
STANDARD OF REVIEW .......... 29
ARGUMENT .......... 29
I. H.B. 1473 Violates The Supremacy Clause. .......... 29
A. H.B. 1473 Unconstitutionally Targets A Federal Spending-Clause Program. .......... 29
1. H.B. 1473 Targets And Parasitizes The Federal 340B Program. .......... 30
2. The 340B Program Is A Spending-Clause Program Between The Federal Government And A Private Entity. .......... 39
3. *McClain* And *Hanaway* Neither Addressed Nor Foreclose A Targeting Argument. .......... 42
B. H.B. 1473 Is Preempted. .......... 44

II. H.B. 1473 Effects Unconstitutional Takings. ....................... 51

A. H.B. 1473 Effectuates Physical Takings By Compelling Unconditional Discounted Sales. ............. 52

B. North Dakota's Takings Are Not For Public Use. ....... 59

III. H.B. 1473 Violates Dormant Commerce Clause Principles. ........................................................................ 60

CONCLUSION ........................................................................................ 64

## TABLE OF AUTHORITIES

**Page(s)**

### Cases


*AbbVie et al. v. Wrigley et al.*,
No. 1:25-cv-00081 (D.N.D.) .......... 9

*AbbVie Inc. v. Drummond*,
808 F. Supp. 3d 1266 (W.D. Okla. 2025)
.......... 37, 46, 50, 52, 57, 58, 60

*AbbVie Inc. v. Weiser*,
No. 25-1439, Dkt. 30 (10th Cir. 2026) .......... 43

*AbbVie v. Brown*,
809 F. Supp. 3d 1341 (D. Utah 2025) .......... 52, 57, 60

*AbbVie, Inc. v. Murrill*,
180 F.4th 747 (5th Cir. 2026) .......... 49

*Am. Hosp. Ass'n v. Kennedy*,
164 F.4th 28 (1st Cir. 2026) .......... 22

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 45

*Ass'n for Accessible Meds. v. Ellison*,
140 F.4th 957 (8th Cir. 2025) .......... 1, 28, 60, 61, 62, 63

*Astra USA, Inc. v. Santa Clara County*,
563 U.S. 110 (2011) .......... 1, 9, 10, 32, 47, 56

*AstraZeneca Pharms. LP v. McClain*,
2025 WL 4092197 (E.D. Ark. Sept. 30, 2025) .......... 52

*Aulston v. Astrue*,
277 F. App'x 663 (8th Cir. 2008) .......... 43

*Barnes v. Gorman*,
536 U.S. 181 (2002) .......... 39, 57

*Boeing Co. v. Movassaghi*,
768 F.3d 832, 840 (9th Cir. 2014 .......... 32

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) ........ 40

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ........ 50, 51

*Calder v. Bull*,
3 U.S. 386 (1798) ........ 51, 59

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) ........ 1, 52, 53, 54, 55, 56

*Churchill Downs Technology Initiatives Co. v. Michigan Gaming Control Board*,
162 F.4th 631 (6th Cir. 2025) ........ 37, 38

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004) ........ 43

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ........ 47, 48

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022) ........ 40

*DiCroce v. McNeil Nutritionals, LLC*,
82 F.4th 35 (1st Cir. 2023) ........ 51

*Entergy Ark., LLC v. Webb*,
122 F.4th 705 (8th Cir. 2024) ........ 62

*Forest Park II v. Hadley*,
336 F.3d 724 (8th Cir. 2003) ........ 1, 29, 35, 36, 42, 48, 49

*Golden State Transit Corp. v. City of Los Angeles*,
475 U.S. 608 (1986) ........ 50

*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174 (1988) ........ 31

*Guy v. Baltimore*,
100 U.S. 434 (1880) ........ 63

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) ........ 1, 54, 55

*Kelo v. City of New London*,
545 U.S. 469 (2005) ........ 1, 51, 59, 60

*King v. Navy Fed. Credit Union*,
148 F.4th 628 (9th Cir. 2025) .......... 38

*Landor v. La. Dep't of Corr. & Pub. Safety*,
146 S. Ct. 1931 (2026) .......... 39, 40

*Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*,
469 U.S. 256 (1985) .......... 41, 42

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) .......... 60

*McCulloch v. Maryland*,
17 U.S. 316 (1819) .......... 1, 5, 30, 35

*Me. Forest Prods. Council v. Cormier*,
51 F.4th 1 (1st Cir. 2022) .......... 50

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) .......... 63

*Noreen v. PharMerica Corp.*,
833 F.3d 988 (8th Cir. 2016) .......... 29

*North Dakota v. United States*,
495 U.S. 423 (1990) .......... 31

*Novartis Pharms. Corp. v. Espinosa*,
2021 WL 5161783 (D.D.C. Nov. 5, 2021) .......... 46

*Novartis Pharms. Corp. v. Hanaway*,
180 F.4th 1097 (8th Cir. 2026)
.......... 5, 8, 24, 28, 43, 45, 49, 61, 62, 63

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024)
.......... 3, 11, 12, 15, 16, 18, 33, 41, 46, 54, 62

*O'Brien v. HHS*,
766 F.3d 862 (8th Cir. 2014) .......... 43

*Osborn v. Bank of the United States*,
22 U.S. 738 (1824) .......... 38

*PhRMA v. McClain*,
95 F.4th 1136 (8th Cir. 2024) .......... 5, 43, 49

*PhRMA v. McCuskey*,
171 F.4th 675 (4th Cir. 2026) .................... 18, 30, 31, 36, 39, 41, 42, 50

*PhRMA v. Morrisey*,
760 F. Supp. 3d 439 (S.D. W. Va. 2024) ............................................ 18

*Rust v. Sullivan*,
500 U.S. 173 (1991) ........................................................................ 40

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023) ........................................................... 3, 18

*United States v. Washington*,
596 U.S. 832 (2022) .................................................... 30, 31, 32, 35, 38

*Univ. of Mich. Hosps. & Health Ctrs. v. CVS Health Corp.*,
No. 2:26-cv-11618 (E.D. Mich. May 18, 2026) .................................... 14

*Va. Hosp. & Healthcare Ass'n v. Roberts*,
671 F. Supp. 3d 633 (E.D. Va. 2023) .................................................. 57

*Valancourt Books, LLC v. Garland*,
82 F.4th 1222 (D.C. Cir. 2023) ........................................................ 1, 58

**Statutes**

42 U.S.C. § 256b ........................................................................... 1, 8

42 U.S.C. § 256b(a) ........................................................................... 56

42 U.S.C. § 256b(a)(1) ............................................................... 9, 32, 39

42 U.S.C. § 256b(a)(4) ........................................................................ 17

42 U.S.C. § 256b(a)(5)(A)(i) ................................................................. 9

42 U.S.C. § 256b(a)(5)(B) ...................................................................... 9

42 U.S.C. § 256b(a)(5)(C) ........................................................... 9, 45, 46

42 U.S.C. § 256b(d)(1)(B)(vi) ............................................................... 10

42 U.S.C. § 256b(d)(2)(B)(v) ................................................................ 10

42 U.S.C. § 256b(d)(3)(A) ............................................................... 10, 45

42 U.S.C. § 256b(d)(3)(B)(iv) .......................................................... 10, 45

42 U.S.C. § 1396r-8(a)(1) ................................................................ 32, 56

42 U.S.C. § 1396r-8(a)(5) .................... 32

42 U.S.C. § 1396r-8(a)(5)(A) .................... 8

N.D. Cent. Code § 43-15.3-08(3)(a)(1) .................... 20

N.D. Cent. Code § 43-15.3-08(3)(a)(2) .................... 20, 33

N.D. Cent. Code § 43-15.3-08(3)(a)(3) .................... 20, 33, 38, 53

N.D. Cent. Code § 43-15.3-08(3)(b) .................... 22, 33, 48

N.D. Cent. Code § 43-15.3-08(3)(b)(1) .................... 21, 33, 53

N.D. Cent. Code § 43-15.3-08(3)(b)(1)-(2) .................... 33, 49

N.D. Cent. Code § 43-15.3-08(3)(b)(2) .................... 21

N.D. Cent. Code § 43-15.3-08(3)(b)(2)-(5) .................... 53

N.D. Cent. Code § 43-15.3-08(3)(b)(3) .................... 21, 45, 48

N.D. Cent. Code § 43-15.3-08(3)(b)(4) .................... 21

N.D. Cent. Code § 43-15.3-08(3)(b)(5) .................... 22, 47, 48

N.D. Cent. Code § 43-15.3-08 *et seq.* .................... 1

N.D. Cent. Code § 43-15.3-09 .................... 23

N.D. Cent. Code § 54-12-01(2) .................... 22, 48

N.D. Cent. Code § 54-12-02 .................... 22, 48

N.D. Cent. Code § § 43-15.3-08(3)(b)(4) .................... 33, 49

## Other Authorities

HRSA, *Clarification of HRSA Audits* 2 (Feb. 8, 2013) https://tinyurl.com/ycxf86cd .................... 15

## Regulations

42 C.F.R. § 10.21(a)(1) .................... 10

42 C.F.R. § 10.21(a)(2) .................... 10

59 Fed. Reg. 25,110 (1994) .................... 46

61 Fed. Reg. 43,549 (Aug. 23, 1996) .......... 11
61 Fed. Reg. 65,406 (Dec. 12, 1996) .......... 11, 46
75 Fed. Reg. 10,272 (Mar. 5, 2010) .......... 12
89 Fed. Reg. 28,643 (Apr. 19, 2024) .......... 10
91 Fed. Reg. 48,883 (Aug. 3, 2026) .......... 22, 27, 46, 47, 48

**Constitutional Provisions**

U.S. CONST. amend. V .......... 1, 51, 59
U.S. CONST. art. I, § 8, cl. 3 .......... 1, 60
U.S. CONST. art. VI, cl. 2 .......... 1, 29, 30, 35, 39

## STATEMENT OF ISSUES

1. Whether H.B. 1473 violates the Supremacy Clause because: (A) it targets a federal Spending Clause program for state regulation, or (B) it is preempted as a state law that obstructs the federal government's implementation of Section 340B. U.S. CONST. art. VI, cl. 2; 42 U.S.C. § 256b; N.D. Cent. Code § 43-15.3-08 *et seq.*; *McCulloch v. Maryland*, 17 U.S. 316 (1819); *Forest Park II v. Hadley*, 336 F.3d 724 (8th Cir. 2003); *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011).
2. Whether H.B. 1473 effectuates an unconstitutional taking. U.S. CONST. amend. V; N.D. Cent. Code § 43-15.3-08 *et seq.*; *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021); *Horne v. Dep't of Agric.*, 576 U.S. 350 (2015); *Kelo v. City of New London*, 545 U.S. 469 (2005); *Valancourt Books, LLC v. Garland*, 82 F.4th 1222 (D.C. Cir. 2023).
3. Whether H.B. 1473 violates dormant Commerce Clause principles. U.S. CONST. art. I, § 8, cl. 3; N.D. Cent. Code § 43-15.3-08 *et seq.*; *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957 (8th Cir. 2025).

## INTRODUCTION

North Dakota has enacted a law, H.B. 1473, that hijacks a federal drug program meant to help rural and underserved patients. The law threatens manufacturers with criminal penalties unless they complete sales that federal law lets them decline—at confiscatory prices, on terms they would otherwise reject. The result is a windfall for large pharmacy chains and in-state providers, not lower prices for patients. No decision of this Court sanctions that regime. The district court correctly held H.B. 1473 unconstitutional; this Court should affirm.

AbbVie creates life-saving medications. In exchange for access to Medicaid and Medicare Part B, Congress requires AbbVie to participate in a separate federal program—the 340B Program—governed by a contract between AbbVie and the United States called a "Pharmaceutical Pricing Agreement" (PPA). That contract requires AbbVie to offer certain medications at substantial discounts—often at penny prices—to certain safety-net hospitals and healthcare providers called "covered entities." That is the bargain: access to Medicaid and Medicare Part B in exchange for an offer to sell certain drugs at a discount, within carefully prescribed federal limits.

Two federal courts of appeals have upheld manufacturers' rights to attach reasonable conditions to their offers to sell at 340B prices, including by limiting the availability of 340B-priced drugs to a single dispensing pharmacy and requiring the provision of claims data to verify that those drugs are dispensed only to eligible patients. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 463-64 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703-06 (3d Cir. 2023). The genesis of these decisions was a decades-long effort by for-profit commercial pharmacies—including Fortune 500 companies—to infiltrate the 340B Program and leverage it for profits at the expense of both AbbVie and indigent patients. The scheme is simple: for-profit pharmacies contract with covered entities to obtain drugs at the 340B price (and thereby become "contract pharmacies"), sell the drugs to customers at full price, and pocket a share of the spread before sharing the leftovers with non-profit providers. For a while, this scheme worked. Pharmacy chains flocked to the 340B Program and quickly inflated it more than tenfold. Eventually, AbbVie and other manufacturers adopted contractual policies that restored the 340B Program to its historic scope, and the federal courts of appeals agreed they had the right to do so.

North Dakota responded by enacting a law, H.B. 1473, which brazenly rewrites the terms of participation in the 340B Program. North Dakota's law demands—on pain of criminal sanctions—that 340B-participating manufacturers sell steeply discounted drugs in circumstances that federal law does ***not*** require. The sole purpose of H.B. 1473 is to impose new requirements and restrictions on a federal drug program—if Congress abolished the federal program tomorrow, H.B. 1473 would have no effect. At the same time, H.B. 1473 forbids manufacturers from requiring the documentation needed to ensure that federally discounted drugs reach covered-entity patients, the only congressionally authorized recipients. And it bans manufacturers from providing the 340B price through rebates that first confirm the drugs went to 340B-eligible patients—the very mechanism the federal government just approved in its pilot program.

To escape these state-law restrictions, AbbVie would need to withdraw entirely from the 340B Program, and thus from Medicaid and Medicare Part B, ***nationally***. That fact is revealing: North Dakota's law operates *exclusively* upon a nationwide federal program, its participants, and their contractual obligations with the United States.

Contrary to the State's suggestion, this Court's prior 340B decisions do not justify this unprecedented law. This Court sustained Arkansas's and Missouri's 340B laws only after construing them to regulate the post-sale delivery of drugs—a subject on which this Court concluded Section 340B "is silent." *PhRMA v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024); *see Novartis Pharms. Corp. v. Hanaway*, 180 F.4th 1097, 1113 (8th Cir. 2026). H.B. 1473 is different in kind: It operates before any sale, dictating the price and other terms of the 340B offer itself. This case also raises arguments not presented in *McClain* and *Hanaway*, and it arises on a developed record from a final judgment.

H.B. 1473 violates the Constitution several times over.

***First***, H.B. 1473 violates the Supremacy Clause in two separate ways. Since *McCulloch v. Maryland*, 17 U.S. 316 (1819), it has been settled that states cannot regulate or alter creations of the Federal Government unless invited to do so. Yet H.B. 1473 unilaterally targets the federal 340B Program, imposing obligations on 340B-participating drug manufacturers that apply to no other manufacturers. These parasitic obligations effectively rewrite the terms of 340B manufacturers' participation in the 340B Program, Medicaid, and Medicare Part B by

forcing them to make 340B-priced sales they would otherwise reject. This state-law intrusion is especially egregious because the 340B Program is a Spending Clause program, meaning that its terms are set by Congress alone and must be clear and unambiguous. By targeting Section 340B, North Dakota adds new, never-agreed-upon requirements to the federal PPA—which the Spending Clause forbids. Whether that intrusion is labeled a violation of *McCulloch*'s structural principles, of intergovernmental immunity, or preemption doctrines, the point remains the same: States cannot target a federal program and its participants for disfavored treatment. Neither *McClain* nor *Hanaway* addressed that point; no party in either case even raised it. By contrast, the federal government has endorsed this argument in recent 340B amicus briefs.

H.B. 1473 is also preempted because it rewrites the terms of manufacturers' bargain with the United States by taking away their right to attach reasonable conditions to their 340B offers, subjecting them to criminal liability if they do not submit to North Dakota's confiscatory scheme, and suppressing the federal forum established by Congress for 340B-related disputes. Neither *Hanaway* nor *McClain* holds otherwise.

***Second***, the Takings Clause prohibits states from compelling physical transfers of property without just compensation or for private use. Yet that is exactly what H.B. 1473 requires. Under H.B. 1473, AbbVie must sell what the State calls "340B drugs"—regular medications at steeply discounted prices, sometimes as low as a penny—to covered entities and contract pharmacies who do not agree to AbbVie's contract-pharmacy policies, even though AbbVie would otherwise reject such sales, as federal law authorizes it to do. Every time H.B. 1473 forces AbbVie to make a discounted sale it would otherwise decline, it works a physical taking of AbbVie's property. AbbVie does not receive just compensation for these compelled 340B-priced sales, and they inure to the benefit of private parties, not the public. The Takings Clause does not condone that kind of private-to-private wealth transfer.

Together, the Supremacy Clause and Takings Clause claims expose the contradiction at the heart of the State's position. If H.B. 1473 regulates a federal drug-pricing program, it violates the Supremacy Clause. If it is instead a standalone state law operating in the gaps of federal law, it effects an uncompensated and unlawful taking. Either way, the law is unconstitutional—and in truth, both constitutional

provisions are implicated. H.B. 1473 violates the Supremacy Clause and the Takings Clause.

***Third***, North Dakota's law violates dormant Commerce Clause principles by imposing burdens on out-of-state entities and interstate commerce that are clearly excessive in relation to any putative local benefits. *Hanaway* does not foreclose these arguments; this Court held that the Missouri law in *Hanaway*—unlike H.B. 1473—"d[id] not purport to regulate transactions between drug manufacturers and their wholesalers." 180 F.4th at 1107. *Hanaway* was also litigated on a different, limited preliminary-injunction record.

For those reasons, this Court should affirm the judgment below.

## STATEMENT OF THE CASE

### A. The 340B Pricing Program.

In 1992, Congress enacted Section 340B of the Public Health Service Act, establishing the "340B Program" as a condition of access to other federal healthcare programs. 42 U.S.C. § 256b. To participate in Medicaid and Medicare Part B, pharmaceutical manufacturers must sign a PPA—a contract with the federal government incorporating the statute's requirements. *Id.* § 1396r-8(a)(5)(A).

Under the PPA, manufacturers must "offer" their drugs to a statutorily enumerated set of "covered entit[ies]" for "purchase at or below the applicable ceiling price"—the 340B discount. 42 U.S.C. § 256b(a)(1). Those discounts average more than 60% of a drug's commercial price across AbbVie's products, with some prices as low as one penny per unit. App. 1017; R. Doc. 28-18 ¶ 31.[1]

Section 340B also imposes obligations on covered entities. Covered entities may not sell or "transfer" 340B-priced drugs to anyone other than their own patients (a practice called "diversion"). 42 U.S.C. § 256b(a)(5)(B). Nor may they subject a manufacturer to both the 340B discount and a Medicaid rebate on the same unit of drug (a practice called "duplicate discounting"). *Id.* § 256b(a)(5)(A)(i). And they must permit manufacturers to audit any records directly pertaining to the entity's compliance with these prohibitions. *Id.* § 256b(a)(5)(C).

Congress vested the U.S. Department of Health and Human Services (HHS) with authority to enforce and administer the Program. *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 119-22 (2011). HHS

[1] All references to the district court record ("R. Doc.") are to the record in *AbbVie et al. v. Wrigley et al.*, No. 1:25-cv-00081 (D.N.D.).

may impose civil monetary penalties if a manufacturer "overcharg[es]" a covered entity. 42 U.S.C. § 256b(d)(1)(B)(vi). But HHS's enforcement authority is exclusive: It can address manufacturers' alleged 340B violations, whereas covered entities (and state governments) cannot. *Astra*, 563 U.S. at 117. Congress chose "centralized enforcement" in HHS to avoid "spreading the enforcement burden" beyond the federal government. *Id.* at 119.

To that end, Congress directed HHS to develop an Administrative Dispute Resolution forum (ADR) for claims that a manufacturer has "overcharged" a covered entity, *Astra*, 563 U.S. at 115-16 (citing 42 U.S.C. § 256b(d)(3)(A)), including claims that a manufacturer has "limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price," 42 C.F.R. § 10.21(a)(1). ADR panel members must be 340B policy experts. 89 Fed. Reg. 28,643, 28,644, 28,647 (Apr. 19, 2024).

ADR also provides a forum for manufacturers to resolve concerns about covered entities' diversion or duplicate discounting. *See* 42 C.F.R. § 10.21(a)(2); 42 U.S.C. § 256b(d)(2)(B)(v). Before a manufacturer can bring such a claim, it must "conduct an audit of a covered entity." 42

U.S.C. § 256b(d)(3)(B)(iv). And before conducting an audit, a manufacturer must present "documentation" to support the audit, including "sufficient facts and evidence" establishing "reasonable cause" to believe that the covered entity has violated the statute. 61 Fed. Reg. 65,406, 65,409-10 (Dec. 12, 1996). Manufacturers typically do so by analyzing data associated with specific drug transactions (called "claims data"), which is the only realistic method available to detect covered entities' noncompliance with their statutory obligations. App. 1015-16; R. Doc. 28-18 ¶¶ 23-25, 28. Longstanding HHS guidance requires that covered entities keep claims data, and manufacturers may require them to provide it. *Novartis*, 102 F.4th at 463.

### B. Contract Pharmacies And The Replenishment Model.

Some covered entities lack an in-house pharmacy for dispensing medications to their patients. So in 1996, the Health Resources and Services Administration (HRSA), HHS's sub-agency for the 340B Program, opined that covered entities without an in-house pharmacy could contract with one outside, for-profit pharmacy to dispense drugs purchased at the 340B price. 61 Fed. Reg. 43,549, 43,549-55 (Aug. 23, 1996). Commenters flagged that this arrangement could lead to

diversion, because 340B-priced drugs would be transferred to pharmacies, who obviously are not patients of a covered entity. HRSA proceeded under the assumption that covered entities would maintain title to, and responsibility for, the 340B-priced drugs; commercial pharmacies were to act merely as agents of covered entities. *Id.* at 43,552-54. Despite HRSA's assumptions, commercial pharmacies regularly take title to 340B-priced drugs and fail to act as covered entities' agents. *E.g.*, App. 0993; R. Doc. 28-17 ¶ 12.

In 2010, HRSA changed course: It released new guidance purporting to permit all covered entities—even those with their own in-house pharmacy—to contract with an ***unlimited*** number of contract pharmacies. 75 Fed. Reg. 10,272, 10,273 (Mar. 5, 2010). In the following years, the number of contract pharmacies exploded—from about 1,300 to more than 23,000. *Novartis*, 102 F.4th at 457; *see also* U.S. Gov't Accountability Off., GAO-26-108784, *340B Drug Discount Program: Agency Oversight Has Improved, but Actions Needed to Address Weaknesses* 2 (2025). That is unsurprising: The ability to obtain and sell heavily discounted 340B-priced drugs creates a massive buy-low, sell-

high arbitrage opportunity for covered entities and their contract pharmacies.

Today, commercial pharmacies that contract with covered entities generally rely on an inventory-management system called "the replenishment model." App. 1008-14; R. Doc. 28-18 ¶¶ 10-19. Under this model, a pharmacy fills prescriptions from its own inventory, purchased at market price. App. 1009; R. Doc. 28-18 ¶ 11. The pharmacy does not determine at the point of sale whether the customer is a covered entity's patient. App. 1010-11; R. Doc. 28-18 ¶¶ 15-16. Patients generally pay the full commercial price. App. 1010-11; R. Doc. 28-18 ¶ 16. Only later—often through "third-party administrators" (TPAs) using proprietary algorithms—is a retroactive determination made about which prescriptions went to eligible patients. *See* App. 0996-97; R. Doc. 28-17 ¶ 26; App. 1009-10; R. Doc. 28-18 ¶¶ 12-13.

After the eligibility determination is made, the contract pharmacy, its TPA, or (rarely) the covered entity will then order replacement drugs at the 340B price to replenish the pharmacy's inventory. App. 1009-10; R. Doc. 28-18 ¶ 12. Those 340B-priced drugs are merged into the pharmacy's general inventory and subsequently sold at full price. App.

1008, 1010-11; R. Doc. 28-18 ¶¶ 10, 16. Throughout this process, covered entities are expected to maintain title over the 340B-priced drugs—and control their commercial-pharmacy agents. But the process is anything but foolproof. HHS's Office of Inspector General has observed that "[c]ontract pharmacy arrangements create complications in preventing diversion in the 340B Program … [and] in preventing duplicate discounts." App. 0122; R. Doc. 28-3, at 16; *see* App. 1015-17; R. Doc. 28-18, ¶¶ 22, 28.

The "spread" between the 340B price the covered entity paid and the commercial price at which the contract pharmacy sells the drug is extremely lucrative. Each year, contract pharmacies and third-party administrators earn billions of dollars in 340B profits. Add. 4; App. 1330; R. Doc. 83, at 4; *see also* Complaint ¶ 21, *Univ. of Mich. Hosps. & Health Ctrs. v. CVS Health Corp.*, No. 2:26-cv-11618 (E.D. Mich. May 18, 2026) ("UMich Compl.") (covered entity stating that major contract pharmacies like CVS "profit[] handsomely from the 340B Program"). The profitability of that 340B spread has transformed the 340B Program from an adjunct to Medicaid and Medicare Part B into a major industry of its own. *See* App. 0995; R. Doc. 28-17 ¶ 22. 340B profits are so significant

to national pharmacy chains that any threat to the existing contract-pharmacy model poses a material risk to their business.[2] Indeed, covered entities themselves acknowledge that this is how the process works, including in recently filed lawsuits alleging 340B misconduct by CVS, one of America's largest pharmacy chains and beneficiaries of the replenishment model. *E.g.*, UMich Compl. ¶¶ 79-84.

For these reasons, covered entities and contract pharmacies are incentivized to designate the highest possible number of transactions as eligible for the 340B discount. *Novartis*, 102 F.4th at 457. They are encouraged to make questionable designations, App. 1008, 1011; R. Doc. 28-18 ¶¶ 10, 17, and to target affluent areas of the country for expansion to maximize revenues, *see* App. 0640; R. Doc. 28-11, at 2. Federal agencies have repeatedly recognized that this incentive structure materially increases the likelihood of unlawful diversion. App. 0108; R. Doc. 28-3 at 2; Gov't Accountability Off., GAO-11-836, *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 22 (2011).[3]

---

2 *See* App. 0180; R. Doc. 28-6, at 22; App. 0396; R. Doc. 28-7, at 29.

3 *See* HRSA, *Clarification of HRSA Audits* 2 (Feb. 8, 2013) https://tinyurl.com/ycxf86cd.

The explosion in contract pharmacies has done nothing for the underserved patients 340B was designed to help; 340B discounts are rarely passed on to patients. *See* App. 1001; R. Doc. 28-17 ¶ 44; Add. 4; App. 1330; R. Doc. 83, at 4. Industry experts have observed that needy patients derive little benefit from Program expansion, while many patients see no benefit at all. App. 0620; R. Doc. 28-9, at 3. Or in covered entities' words, "for-profit pharmacies … have seized on the opportunity [created by HRSA's 2010 guidance] to capitalize on substantial 340B drug discounts" and allow their parent companies to "realize substantial profits by looting a federal drug pricing program designed to aid non-profit 340B providers caring for the most resource strapped and vulnerable patients." UMich Compl. ¶ 55.

### C. Manufacturers' Contract-Pharmacy Policies.

Around 2020, drug manufacturers responded to these developments by adopting contract-pharmacy policies that attach "commercially reasonable" conditions to each manufacturer's 340B "offer." *Novartis*, 102 F.4th at 461. Covered entities must agree to these policies in order to accept a manufacturer's offer and complete a sale. Under its current policy, AbbVie offers all covered entities drugs at or

below the ceiling price. App. 1006; R. Doc. 28-18 ¶ 5. But AbbVie will no longer accept orders for 340B-priced drugs for unlimited contract pharmacies partnered with covered entities. *Id.* Instead, for hospital-type covered entities,[4] AbbVie will accept 340B-priced orders for only one contract pharmacy, provided the covered entity lacks an in-house pharmacy and the contract pharmacy is located within 40 miles of the covered entity. *Id.* If a covered entity is unable to identify a contract pharmacy within 40 miles, AbbVie will work with the covered entity to identify a suitable alternative. *Id.*

AbbVie's contract-pharmacy policy also requires that covered entities submit claims data—that is, basic information about a prescription. App. 1015-16; R. Doc. 28-18 ¶¶ 23-25. This information can be used to determine whether a drug should be offered with a 340B discount or a Medicaid rebate. *See id.* AbbVie includes this provision because often, covered entities do not share claims data willingly; that information can reveal anomalies that indicate 340B non-compliance, such as duplicate discounting. App. 1015-17; R. Doc. 28-18 ¶¶ 25, 28.

---

[4] "[D]isproportionate share" hospitals are the main kind of covered entity involved here. 42 U.S.C. § 256b(a)(4). Certain other institutions also qualify as covered entities.

But the data is critical for manufacturers investigating whether reasonable cause exists for an audit of a covered entity as a prerequisite to ADR. *PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 450-53 (S.D. W. Va. 2024); *see also PhRMA v. McCuskey*, 171 F.4th 675, 694-95 (4th Cir. 2026).[5]

Like any contractual condition, these contract-pharmacy policies change the offer on the table. To accept the 340B offer, a covered entity must agree to pay the 340B price for the drugs ***and*** agree to AbbVie's sale terms. If a covered entity refuses the terms, no 340B-priced sale occurs. The D.C. Circuit and Third Circuit have upheld contract-pharmacy policies like AbbVie's as authorized by the 340B statute. *Novartis*, 102 F.4th at 460; *Sanofi Aventis*, 58 F.4th at 704, 707. Covered entities thus have a range of options: They may accept the terms of the 340B offer and complete a 340B purchase, reject the terms of the 340B offer and purchase drugs at the commercial price, or forgo a purchase altogether.

---

[5] The panel decision in *McCuskey*, which affirmed a preliminary injunction against West Virginia's 340B law, was automatically vacated pending en banc review. *McCuskey*, 171 F.4th 675, *reh'g en banc granted*, 176 F.4th 830 (4th Cir. 2026) (mem.).

Neither AbbVie's contract-pharmacy policy nor H.B. 1473 changes the price a *patient* pays—patients almost always pay full price at the pharmacy counter, whether or not they are patients of covered entities. That is why TPAs and covered entities find the contract-pharmacy relationship worthwhile: The pharmacies charge the standard price set by the patient's insurer (or the patient pays out of pocket) and split the "spread" with TPAs and covered entities. App. 0993, 1001; R. Doc. 28-17 ¶¶ 15-16, 44; App. 1008, 1010-11; R. Doc. 28-18 ¶¶ 10, 16. Indeed, drug transactions are often only retroactively determined to be 340B-eligible, after the sale occurs, which changes nothing about the price the patient paid at the point of sale. App. 1006-07, 1009-10; R. Doc. 28-18 ¶¶ 6, 11-13, 15.

Further, neither AbbVie's policy nor H.B. 1473 affects whether or where patients may fill their prescriptions, or the locations to which AbbVie will deliver its drugs pursuant to an accepted offer. App. 1007-08; R. Doc. 28-18 ¶ 9a. AbbVie's policy determines whether AbbVie makes a sale at the 340B price—not where its drugs may go once sold. Once an offer is accepted, AbbVie "will deliver its drugs … to any pharmacy, anywhere" they can be lawfully sold. *Id.*

### D. The North Dakota Law.

North Dakota enacted H.B. 1473 in April 2025, and it took effect August 1, 2025. *See* Add. 10; App. 1336; R. Doc. 83, at 10. The statute is keyed entirely to the federal 340B Program. For example, a "drug" under H.B. 1473 is "a drug purchased under reduced pricing under section 340B of the federal Public Health Service Act [42 U.S.C. § 201 *et seq*.] by a covered entity." N.D. Cent. Code § 43-15.3-08(3)(a)(3). A "covered entity" is "an entity participating or authorized to participate in a federal drug discount program under 42 U.S.C. 256b." *Id.* § 43-15.3-08(3)(a)(2). And a "contract pharmacy" is "a pharmacy that has a contract with a covered entity to receive and dispense drugs to the covered entity's patients on its behalf." *Id.* § 43-15.3-08(3)(a)(1). In short, H.B. 1473 has no independent reach: It regulates only 340B transactions, and where Section 340B does not apply, neither does H.B. 1473.

H.B. 1473 imposes at least three restrictions and obligations on 340B manufacturers that federal law does not.

***First***, H.B. 1473 attempts to ban AbbVie's federally authorized policies limiting the terms on which contract pharmacies acquire 340B-priced drugs. It provides that a drug manufacturer may not

"[d]irectly or indirectly deny, restrict, prohibit, or otherwise interfere with the acquisition of a drug by a contract pharmacy on behalf of a covered entity unless receipt of the drug is prohibited by federal law." N.D. Cent. Code § 43-15.3-08(3)(b)(1). Similarly, North Dakota forbids manufacturers from prohibiting a contract pharmacy from dispensing a drug "by denying access to the drug." *Id.* § 43-15.3-08(3)(b)(2). Nor may manufacturers "[i]nterfere with the ability of a covered entity or contract pharmacy to dispense a drug to an eligible patient of the covered entity." *Id.* § 43-15.3-08(3)(b)(4). These provisions require AbbVie to complete contract-pharmacy transactions that federal law would allow it to decline.

***Second***, H.B. 1473 strips manufacturers of their federally recognized right to condition 340B offers on the submission of claims data. Under the law, a manufacturer may not "[r]equire a covered entity or contract pharmacy to submit any claims, encounter, or utilization data as a condition for acquiring or receiving a drug, unless the claims, encounter, or utilization data sharing is required by federal law." *Id.* § 43-15.3-08(3)(b)(3).

***Third***, H.B. 1473 eliminates manufacturers' ability to offer the 340B discount as a rebate. Under a rebate model, a manufacturer sells a drug at the commercial price and then pays the covered entity the difference between that price and the 340B ceiling price, after verifying that the transaction was 340B-eligible. HRSA recently announced a pilot program under which participating manufacturers will provide the 340B price through rebates, beginning January 1, 2027. 91 Fed. Reg. 48,883 (Aug. 3, 2026).[6] Yet under North Dakota's law, a manufacturer may *not* "[o]ffer or otherwise make available a drug in the form of a rebate, unless in the form of a discount at the time of sale and authorized under federal law." N.D. Cent. Code § 43-15.3-08(3)(b)(5). This provision targets the 340B Program, dictating the terms of manufacturers' compliance.

Violations of H.B. 1473's provisions are class B misdemeanors, N.D. Cent. Code § 43-15.3-08(3)(b), enforceable by the Attorney General, *see id.* §§ 54-12-01(2), 54-12-02. H.B. 1473 also allows the State Board of

[6] In 2025, HRSA established a similar pilot program, but that program was preliminarily enjoined for allegedly failing to account for certain interests of covered entities. *See Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 32-34 (1st Cir. 2026). The agency agreed to vacatur and remand, and announced a new pilot program on August 3, 2026 that addresses the issues identified in *Kennedy*.

Pharmacy to seek civil penalties, revoke licenses, and pursue injunctive relief. *See id.* § 43-15.3-09.

### E. The North Dakota Litigation.

AbbVie and other manufacturers sued North Dakota shortly after it enacted H.B. 1473, challenging the law under the Supremacy Clause, the Takings Clause, and the Commerce Clause, among other provisions, and seeking declaratory and permanent injunctive relief. App. 0060-64; R. Doc. 25 ¶¶ 124–31. AbbVie and PhRMA moved for summary judgment, as did the State. App. 0015-16. On April 27, 2026, the district court granted AbbVie and PhRMA's motions for summary judgment as to the Supremacy Clause (for PhRMA) and the dormant Commerce Clause (for both AbbVie and PhRMA). Add. 31-32; App. 1357-58; R. Doc. 83, at 31-32. The district court denied plaintiffs' other requests for summary judgment as moot and enjoined the enforcement of H.B. 1473 against AbbVie, PhRMA, and affiliated entities. It did not address AbbVie's Takings Clause claim on the merits, but the same opinion denied the State's motion for judgment on the pleadings on AstraZeneca's takings claim. Add. 30-31; App. 1356-57; R. Doc. 83, at 30-31.

The district court explained that its decision was fully consistent with *McClain*'s holding that Arkansas's 340B law was not preempted because the Arkansas law was "materially distinguishable from the North Dakota law." Add. 17; App. 1343; R. Doc. 83, at 17. As the court observed, "Arkansas formally defined its law only to apply to medication delivery and indicated it would only be enforced [that way]." *Id.* "North Dakota's H.B. 1473," by contrast, "is not a delivery statute"; by the State's own admission, it applies pre-sale and thus "regulates manufacturers, not pharmacies." Add. 17-18; App. 1343-44 R. Doc. 83, at 17-18.

The State appealed on April 29, 2026 and filed its opening brief on June 17, without seeking a stay or other relief pending appeal. On July 1, this Court decided *Hanaway*, which affirmed the denial of a preliminary injunction against Missouri's 340B law—a statute Missouri defended, and this Court treated, as regulating only the *delivery* of 340B drugs, not their price or other 340B offer terms. 180 F.4th 1097, 1113-14. Based on the preliminary-injunction record before the Court, *Hanaway* held that the manufacturer there had not shown that it was likely to succeed on the merits of its dormant Commerce Clause, field-preemption, and conflict-preemption arguments. *Id.* at 1106-14. No party in *Hanaway* (or

*McClain*) argued that the state law at issue unconstitutionally targeted a federal program, prohibited manufacturers from collecting claims data, or violated the Takings Clause. And neither the Arkansas law nor Missouri law imposed criminal liability for violations.

After *Hanaway* was decided, the State belatedly sought a stay of the district court's judgment pending appeal—more than two months after the fact. The district court denied the motion, explaining that "stark differences exist between the Missouri law analyzed in *Hanaway* and North Dakota's" and that the State had not demonstrated irreparable harm. R. Doc. 98, at 3. The State's stay motion in this Court remains pending.

## SUMMARY OF ARGUMENT

North Dakota's H.B. 1473 has a single object: to rewrite the terms of a federal drug-pricing program and compel manufacturers to part with their property on terms they would never accept, all in favor of in-state interests. The district court correctly held the law unconstitutional, and neither *McClain* nor *Hanaway* supports a contrary result.

**I.** H.B. 1473 violates the Supremacy Clause several times over.

**A.** Since *McCulloch v. Maryland*, it has been settled that states cannot target federal programs or their participants for disfavored treatment. H.B. 1473 does exactly that. It applies only to 340B transactions, imposes obligations on 340B-participating manufacturers that federal law does not, and would regulate nothing at all if Congress repealed Section 340B tomorrow. The intrusion is especially egregious because Section 340B is a Spending Clause program: Its terms are set by Congress alone, and North Dakota's parasitic requirements rewrite a federal bargain to which the State is not a party. Neither *McClain* nor *Hanaway* authorizes that intrusion; those cases did not address a targeting argument under *McCulloch* and did not purport to address a law that "directly alters manufacturer conditions" on 340B offers. Add. 4; App. 1330; R. Doc. 83, at 4. The federal government has endorsed AbbVie's anti-targeting argument in recent 340B amicus briefs.

**B.** H.B. 1473 is also preempted. Congress centralized 340B enforcement in the federal government, and manufacturers reach that federal forum by documenting suspected violations with claims data. H.B. 1473 bans the claims-data conditions that make the federal framework work. HRSA itself has recently confirmed that requiring

claims data creates an "inherent incentive for accurate reporting," 91 Fed. Reg. at 48,901, and its new rebate pilot—which would provide 340B reimbursements as a rebate after confirming the eligibility of a 340B transaction—requires the exact claims data that H.B. 1473 forbids manufacturers from collecting. Once again, *McClain* and *Hanaway* do not save the law: H.B. 1473 regulates the terms of the 340B offer itself under threat of criminal liability, whereas the Arkansas and Missouri statutes were construed as post-sale delivery rules, contained no claims-data prohibition, and carried no criminal penalties.

**II.** H.B. 1473 also effects an unconstitutional taking because it forces drug manufacturers to sell their products to covered entities and commercial pharmacies at bargain-bin prices on terms the manufacturers would otherwise reject. The North Dakota law thus forces drug manufacturers to part from their property in circumstances when federal law does not. This physical taking effected by H.B. 1473 serves no public use, as AbbVie demonstrated; it works a pure wealth transfer between drug manufacturers, covered entities, and commercial pharmacies. The State cannot avoid this conclusion by arguing that manufacturers' participation in Medicaid, Medicare Part B, and the 340B

Program is voluntary. Even if that were true, it does not make submission to H.B. 1473 voluntary. AbbVie accepted the federal bargain; it never accepted North Dakota's criminally enforced add-ons, and the only way to escape them is to exit the federal programs nationwide. H.B. 1473 is thus unconstitutional regardless of how it is understood: If H.B. 1473 regulates 340B offers under the PPA with the Federal Government, the Supremacy Clause condemns it (and so does the Takings Clause); if it applies independently of the PPA, the Takings Clause violation is even clearer because it confirms that H.B. 1473 itself compels 340B-priced sales that manufacturers may lawfully decline under the 340B Program.

**III.** H.B. 1473 also violates dormant Commerce Clause principles: It compels out-of-state transactions for the benefit of in-state entities, imposing burdens on interstate commerce that are clearly excessive in relation to any putative local benefits. *See Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025). "[A]t this stage in litigation," and unlike in *Hanaway*, AbbVie has demonstrated that H.B. 1473 cannot withstand Commerce Clause scrutiny. *Cf. Hanaway*, 180 F.4th at 1109.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo* and the issuance of a permanent injunction for abuse of discretion. *Forest Park II v. Hadley*, 336 F.3d 724, 731 (8th Cir. 2003). The Court may affirm on any ground supported in the record. *Noreen v. PharMerica Corp.*, 833 F.3d 988, 992 (8th Cir. 2016).

## ARGUMENT

### I. H.B. 1473 Violates The Supremacy Clause.

H.B. 1473 targets a federal Spending Clause program and its participants for disfavored treatment, functioning only as an adjunct of the federal scheme. State laws with such designs violate the Supremacy Clause—whether examined through the structural principles embodied in *McCulloch v. Maryland* and the doctrine of intergovernmental immunity, or standard preemption principles.

#### A. H.B. 1473 Unconstitutionally Targets A Federal Spending-Clause Program.

North Dakota's H.B. 1473 imposes regulatory burdens exclusively on manufacturers who participate in the federal 340B Program. It therefore violates the oldest and most fundamental principle of Supremacy Clause jurisprudence: that "[t]he States have no power, by

taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the [federal] government." *McCulloch*, 17 U.S. at 436. H.B. 1473's interference with the 340B Program is especially problematic because the 340B Program is a Spending Clause program in the nature of an express contract between AbbVie and the Federal Government, to which North Dakota is not a party. A panel of the Fourth Circuit endorsed closely analogous arguments in *McCuskey*, 171 F.4th at 687-93 (enjoining West Virginia's 340B law), and the district court here correctly recognized that this Court's prior decisions in *McClain* and *Hanaway* neither addressed nor foreclose them. By tacking additional requirements onto the 340B Program, H.B. 1473 violates the Supremacy Clause.

### 1. H.B. 1473 Targets And Parasitizes The Federal 340B Program.

Since *McCulloch v. Maryland*, the Supreme Court has recognized that states cannot interfere with or control the operations of the Federal Government by targeting federal programs for state regulation. *United States v. Washington*, 596 U.S. 832, 838 (2022) (citing *McCulloch*, 17 U.S. at 436). This anti-targeting principle prohibits "state laws that *either*

'regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals.'" *Id.* (alterations omitted) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.)). State laws impermissibly discriminate when they single out federal operations for unfavorable treatment or regulate them unfavorably on some basis related to their governmental status. *Id.* at 839.

This anti-targeting principle is sometimes "called the intergovernmental immunity doctrine," especially when applied to state laws that "discriminat[e] against the Federal Government or its contractors." *Washington*, 596 U.S. at 839. The same principle animates preemption doctrine. *E.g.*, *McCuskey*, 171 F.4th at 687; Add. 21-22; App. 1347-48; R. Doc. 83, at 21-22. Regardless of how the anti-targeting principle is labeled, "[t]he common thread is that the more directly the State targets federal functions, the less Congress needs to say for the state law to give way," whereas a state law is more likely to be upheld when the "State acts in its ordinary regulatory lane" by enacting a law of general applicability in an area of traditional state regulation. *McCuskey*, 171 F.4th at 688 (citing *Goodyear Atomic Corp. v. Miller*, 486

U.S. 174, 180 (1988); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014)).

H.B. 1473 violates the Supremacy Clause under these principles because it exclusively targets a federal creation, the 340B Program. Section 340B established a federal program requiring drug manufacturers to offer discounts on covered outpatient drugs to specified health care providers as a condition of the manufacturers' participation in Medicaid and Medicare Part B. 42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1), (5); *supra*, at 8-9. Unlike cooperative-federalism programs, the 340B Program is exclusively federal: "States have no part" in the 340B Program, in the PPA relationship between manufacturers and the Federal Government, or in the 340B offers made pursuant to the PPA. *See* Add. 22; App. 1348; R. Doc. 83, at 22; *Astra*, 563 U.S. at 119-20.

Yet H.B. 1473 attaches to, "interfere[es] with," and "control[s] the operations of" the 340B Program. *Washington*, 596 U.S. at 838. H.B. 1473 imposes burdens exclusively on manufacturers who participate in the federal 340B Program, applying only where federal law applies. This is clear on the face of the North Dakota law: A "drug" under H.B. 1473 is one "purchased under reduced pricing under section 340B of the federal

Public Health Service Act [42 U.S.C. § 201 *et seq*.] by a covered entity." N.D. Cent. Code § 43-15.3-08(3)(a)(3). A "covered entity" is "an entity participating or authorized to participate in" the 340B Program—*i.e.*, "a federal drug discount program under 42 U.S.C. 256b." *Id.* § 43-15.3-08(3)(a)(2). And H.B. 1473 governs the "acquisition" of drugs, *id.* § 43-15.3-08(3)(b)(1), only when they are part of the 340B Program—which is to say, sold at the 340B price, *id.* § 43-15.3-08(3)(a)(3).

H.B. 1473 fundamentally alters manufacturers' obligations under their PPAs. Absent H.B. 1473, federal law would allow a 340B-participating drug manufacturer to condition a 340B-priced offer on the covered entity's agreement with the manufacturer's contract-pharmacy policy. *Novartis*, 102 F.4th at 460; *supra*, at 3. Rejection of that condition would amount to rejection of the 340B offer, and AbbVie would not be required to complete the sale at the 340B price.

H.B. 1473 seeks to change that result by interfering with the 340B offer. Under H.B. 1473, a 340B-participating manufacturer must sell drugs at the 340B price even if the covered entity declines to agree to the contract-pharmacy offer terms. *See* N.D. Cent. Code § 43-15.3-08(3)(b)(1)-(2), (4). Refusing to do so is a crime. *Id.* § 43-15.3-08(3)(b).

H.B. 1473 thus operates pre-sale to forbid offer terms that federal law allows and to impose requirements on top of the federal PPA governing the 340B offer. The State embraces these aspects of H.B. 1473's design: It admits that H.B. 1473 "target[s]" the "preconditions for the sale of [manufacturers'] 340B drugs," Br. 32, and stresses that H.B. 1473 applies to "limitations in the 340B pricing and sale agreements," Br. 45-46.

By contrast, H.B. 1473 has nothing to say about the acquisition or delivery of drugs sold at commercial prices outside the 340B Program. Br. 3. When AbbVie offers Imbruvica under the federal 340B Program, North Dakota changes the terms of AbbVie's offer; when AbbVie offers Imbruvica in an ordinary commercial transaction, H.B. 1473 has nothing to say. Indeed, H.B. 1473 would regulate nothing if Congress repealed Section 340B and terminated the 340B Program. It operates parasitically, existing solely to impose state-law rules atop the federal 340B Program.

This "impermissible insertion into a federal program that Congress did not invite" violates the Supremacy Clause. Add. 20; App. 1346; R. Doc. 83, at 20. H.B. 1473 improperly "interfer[es] with" the operations of the Federal Government by adopting parasitic rules that apply only to

drug manufacturers' 340B offers under the 340B Program. *Washington*, 596 U.S. at 838. The Supremacy Clause forbids state laws that target federal programs in this way—states may not "discriminate against the Federal Government or those with whom it deals" by "singl[ing them] out for less favorable treatment" or "regulat[ing] them unfavorably on some basis related to their governmental status." *Id.* at 839 (quotation marks omitted). North Dakota simply has "no power" to "burden, or in any manner control," the operation of a law "enacted by congress to carry into execution the powers vested in the [federal] government." *McCulloch*, 17 U.S. at 436.

This Court has applied these principles in analogous circumstances. In *Forest Park II*, a private apartment owner that participated in a federal low-income housing program sought to withdraw from the program pursuant to the terms established by the Federal Government. 336 F.3d at 731-32. But Minnesota had enacted statutes "requir[ing] that owners of federally subsidized low-income housing follow additional requirements" beyond "those contained in the federal statute and regulations." *Id.* at 730. Minnesota argued that the owner could "comply with both federal and state requirements" and that

the laws "have the same underlying purpose," but this Court held that the state law impermissibly "regulate[d] or restrict[ed]" the federal program. *Id.* at 732. Because "state statutes may not interfere with the implementation of a federal program by a federal agency," the Minnesota law yielded to the federal program. *Id.* In the same way, North Dakota has grafted state-law requirements onto the federal 340B Program. Drug manufacturers are thus "being prohibited by a state law from taking the action that the federal government has otherwise authorized." *Id.* at 731-32. This arrangement "fl[ies] in the face of the Constitution's Supremacy Clause." *Id.* at 732.

Other courts have applied the Supremacy Clause's anti-targeting principle to block parasitic state laws. In *McCuskey*, for example, a Fourth Circuit panel held that West Virginia's 340B law likely violated the Supremacy Clause. 171 F.4th at 687-93. While that decision has been vacated pending en banc rehearing, its reasoning is persuasive and squarely on-point. Similarly, *Drummond* held that an Oklahoma statute was likely preempted because it targeted the 340B Program by regulating so-called "340B drugs," recognizing that "the only difference between a '340B drug' and a non-340B drug" is whether Section 340B

applies to the drug. *AbbVie Inc. v. Drummond*, 808 F. Supp. 3d 1266, 1276 (W.D. Okla. 2025).

In *Churchill Downs Technology Initiatives Co. v. Michigan Gaming Control Board*, 162 F.4th 631 (6th Cir. 2025), the Sixth Circuit enjoined the enforcement of a Michigan statute that attempted to add requirements to a federal horseracing statute. *Id.* at 634-35. *Churchill* involved an Oregon-based online platform that accepted wagers on horseraces from anywhere in the country. *Id.* A federal statute authorized this practice as long as the company obtained consent from the racetrack's racing association, Oregon and the racetrack's home state. *Id.* But Michigan purported to require the company to obtain a Michigan license before accepting bets "placed by persons within the state's borders." *Id.* at 636. The Sixth Circuit held that this maneuver unlawfully "target[ed] the federal scheme by bolting on an additional consent for wager acceptances." *Id.* at 639. *Churchill* explained that "[t]he Supreme Court has disapproved of states tailoring regulation to target federal schemes…." *Id.* This principle applies even if the state law can be characterized as "shar[ing] federal aims." *Id.*

Importantly, and as these cases illustrate, the *McCulloch* anti-targeting principle is not limited to laws that target a federal agency or other government entity. It applies any time a state attempts to "interfer[e] with or contro[l] the operations of the Federal Government" by targeting federal operations for regulation and thereby discriminating against them. *See Washington*, 596 U.S. at 838-39; *Osborn v. Bank of the United States*, 22 U.S. 738, 866-67 (1824) (rejecting the argument that *McCulloch*'s protection extended only to "public institutions, such as the mint or the post office"). Even laws that facially are "generally applicable" cannot be used "to impliedly target federal schemes." *Churchill*, 162 F.4th at 639 (citing *King v. Navy Fed. Credit Union*, 148 F.4th 628, 634 (9th Cir. 2025)). And H.B. 1473 lacks even a pretense of general applicability. *E.g.*, N.D. Cent. Code § 43-15.3-08(3)(a)(3) (defining "drug" as one "purchased under reduced pricing under section 340B"). It is a bespoke, "tailor-made" law regulating manufacturers' 340B offers under the 340B Program, not a general law that is "downstream of [North Dakota's] earnest effort to regulate its residents' primary conduct." *Churchill*, 162 F.4th at 639.

H.B. 1473 targets the 340B Program and its participants for regulation. The Supremacy Clause therefore forbids its enforcement.

#### 2. The 340B Program Is A Spending-Clause Program Between The Federal Government And A Private Entity.

H.B. 1473's targeting of the 340B Program is particularly problematic because the 340B Program is a Spending Clause bargain struck between the Federal Government and drug manufacturers. *McCuskey*, 171 F.4th at 689-90, 693; Add. 20-22; App. 1346-48; R. Doc. 83, at 20-22. The 340B Program thus operates like a contract. *See Barnes v. Gorman*, 536 U.S. 181, 186 (2002) ("Spending Clause legislation [is] much in the nature of a *contract*: in return for federal funds, the recipients agree to comply with federally imposed conditions." (citation omitted)); *Landor v. La. Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1941 (2026) ("[C]onditions attached to federal funds … apply only to those who have knowingly and voluntarily agreed to them."). Indeed, AbbVie must sign a contract—a PPA—with the United States to participate in the 340B Program and thus access Medicaid and Medicare Part B. 42 U.S.C. § 256b(a)(1).

The terms of the 340B bargain—manufacturers' access to Medicaid and Medicare Part B in exchange for congressionally identified covered entities receiving offers for steeply discounted drugs—are laid out in the 340B statute and the corresponding PPA. *Supra*, at 2, 8-9. Congress alone "define[s] the limits" of this federal spending program. *See Rust v. Sullivan*, 500 U.S. 173, 194 (1991); *see also Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) ("[O]bligations to and rights of the United States under its contracts are governed exclusively by federal law."). And even Congress cannot spring new requirements on manufacturers. "Congress must rely on consent" when exercising its spending power and give "clear[] and unambiguous[]" notice of a spending condition; if it does not, the condition is invalid. *See Landor*, 146 S. Ct. at 1941; *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) ("Recipients cannot knowingly accept the deal with the Federal Government unless they would clearly understand … the obligations that would come along with doing so." (citation modified)).

If the federal government cannot surprise 340B-participating manufacturers with new conditions, North Dakota certainly cannot. North Dakota is not a party to the Spending Clause bargain between

manufacturers and the Federal Government. Like other "[s]tate interventions in spending-power bargains with non-State entities," H.B. 1473 raises "interference concerns under the Supremacy Clause." *McCuskey*, 171 F.4th at 690 (citing *Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 269-70 (1985)). In *Lawrence County*, for example, Congress gave federal funds to local governments to use for "any governmental purpose." 469 U.S. at 258-59. South Dakota specified that counties should allocate these funds in the same way as their general tax revenues, but the Supreme Court invalidated this requirement as "substantial interference" with the federal program, emphasizing that a State may not obstruct the federal bargain by adding conditions to it. *Id.* at 269-70.

Here, when AbbVie and other drug manufacturers agree to a PPA with the government in exchange for coverage under Medicaid and Medicare Part B, they know—because federal courts have held—that they can attach contract-pharmacy conditions to their offers. *Novartis*, 102 F.4th at 460; *supra*, at 3. Without the right to attach such conditions, the 340B Program becomes a materially worse deal for manufacturers. The Federal Government never notified AbbVie that it needed to comply

with North Dakota's requirements or invited state regulation, and AbbVie never agreed to that deal. North Dakota cannot simply impose it as a matter of state law by adding terms to a federal program. *See Lawrence County*, 469 U.S. at 269-70; *Forest Park II*, 336 F.3d at 731-33 (state cannot add terms interfering with the "relationship" between the federal government and a federal-program participant).

In short, Spending Clause legislation regulates only those who consent to its terms. So when a state attempts to "*directly* regulat[e]" participation in a federal Spending Clause program, the federal law will "oust" these state-law additions under the Supremacy Clause "even without [the] comprehensive terms" that would ordinarily support field preemption. *McCuskey*, 171 F.4th at 695 n.12.

### 3. *McClain* And *Hanaway* Neither Addressed Nor Foreclose A Targeting Argument.

The State contends that *McClain* governs this case, *e.g.*, Br. 28-32, and may argue that the Court's recent decision in *Hanaway* does as well. But neither *McClain* nor *Hanaway* addressed the argument above—that the Supremacy Clause forbids states from targeting and interfering with the 340B Spending Clause program. *Supra*, at 29-42. *McClain* and *Hanaway* addressed only "theories of field, obstacle, and impossibility

preemption" involving different state laws. *McClain*, 95 F.4th at 1139; *see Hanaway*, 180 F.4th at 1111-14.[7]

The State's assertion that this Court "was aware that the 340B program was enacted under the Spending Clause when it decided *McClain*" is irrelevant. Br. 24. No party advanced these arguments in *McClain* (or *Hanaway*), and this Court accordingly did not address them. *See Aulston v. Astrue*, 277 F. App'x 663, 664 (8th Cir. 2008) (per curiam); *O'Brien v. HHS*, 766 F.3d 862, 863 (8th Cir. 2014) (per curiam). *McClain* and *Hanaway* do not foreclose arguments that were "neither brought to the attention of the court nor ruled upon." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004).[8]

The more relevant recent development is the federal government's amicus brief filed in, among other cases, *AbbVie Inc. v. Weiser*, No. 25-1439, Dkt. 30 (10th Cir. 2026). *See generally* R. Doc. 67-1. The United

[7] The district court used the heading "Field Preemption" in its opinion, but it distinguished the field-preemption arguments addressed in *McClain* from the arguments raised here, which it described as "field preemption regarding Congress's spending power." Add. 18; App. 1344; R. Doc. 83, at 18.

[8] The Arkansas and Missouri laws in *McClain* and *Hanaway* are also distinguishable from North Dakota's H.B. 1473, for the reasons explained below. *Infra*, at 44-51.

States agrees that State laws targeting contract-pharmacy arrangements do "not regulate the safety of prescription drugs or pharmacy operations or even state contracts" because such laws "operate[] only within the 340B Program." *Id.* at 19-20 & n.7. Laws with that design "impermissibly target[] and discriminate[] against manufacturers that participate in a federal program." *Id.* at 12. Many courts, including this one, have yet to consider that argument.

* * *

North Dakota has singled out the federal 340B Program and its participants for burdens that H.B. 1473 imposes on no one else, and it has rewritten the terms of a Spending Clause bargain to which the State is not a party. *McCulloch* and two centuries of precedent forbid that intrusion. H.B. 1473 violates the Supremacy Clause.

**B. H.B. 1473 Is Preempted.**

The district court was also correct to hold that H.B. 1473 is preempted. To be sure, *McClain* and *Hanaway* held that "Section 340B does not preempt the field of 340B regulation and that the 340B Program's enforcement mechanisms do not preempt the field of 340B

enforcement." *Hanaway*, 180 F.4th at 1112-13.[9] But "[e]ven if Congress has not occupied a field of regulation, a state law is preempted" where it conflicts with or serves as an obstacle to the accomplishment of federal law. *Id.* at 1113. H.B. 1473—which is broader and harsher than the laws addressed in *McClain* and *Hanaway*—is preempted under that standard. *See* Add. 11; App. 1337; R. Doc. 83, at ¶¶ 26, 32, 53 ("North Dakota, unlike other states, adds criminal penalties."); R. Doc. 98 ¶ 5 ("North Dakota's law is harsher than Missouri's.").

***First***, Subsection (b)(3) expressly bans claims-data conditions. N.D. Cent. Code § 43-15.3-08(3)(b)(3). That provision is preempted because the 340B Program could hardly function as intended without such conditions. Congress expressly prohibited diversion and duplicate discounts, but a manufacturer must "conduct an audit" of a covered entity before initiating an ADR claim on these subjects. 42 U.S.C.

---

[9] AbbVie respectfully submits that *McClain* and *Hanaway* misapplied preemption principles when they rejected manufacturers' field-preemption arguments. If there is a "field of 340B regulation" and of "340B enforcement," then "the 340B Program's enforcement mechanisms," *Hanaway*, 180 F.4th at 1112-13, should preempt rival state enforcement mechanisms, *see Arizona v. United States*, 567 U.S. 387, 406 (2012) ("Although [Arizona's immigration law] attempts to achieve one of the same goals as federal law … it involves a conflict in the method of enforcement.").

§ 256b(a)(5)(C), (d)(3)(A), (d)(3)(B)(iv). And HRSA—which claims authority to preapprove audits—requires "documentation" of "reasonable cause" to suspect diversion or duplicate discounting by a covered entity. 61 Fed. Reg. at 65,406-10; *see also* 42 U.S.C. § 256b(a)(5)(C) (delegating audit-related authority). "[C]laims data … [is] the way to detect possible diversion or double-dipping on discounts." *Drummond*, 808 F. Supp. 3d at 1278; *see* App. 1015-17; R. Doc. 28-18 ¶¶ 25, 28. Indeed, when HRSA announced its 340B rebate pilot, the agency affirmed the importance of claims data in promoting 340B Program integrity. 91 Fed. Reg. at 48,901 (requiring covered entities to "submit validated claims data as a precondition to receiving the discount" creates "an inherent incentive for accurate reporting" and "reduc[es] the opportunity for duplicate discounts to go undetected").

Congress "preserv[ed] … the ability of sellers to impose at least some delivery conditions." *See Novartis*, 102 F.4th at 460, 463; 61 Fed. Reg. at 65,406-10; *accord Novartis Pharms. Corp. v. Espinosa*, 2021 WL 5161783, at *7 (D.D.C. Nov. 5, 2021) (HRSA has long permitted manufacturers to include additional contract terms (citing 59 Fed. Reg. 25,110, 25,114 (1994)). Claims-data conditions are necessarily among the

conditions that Congress permitted—Congress would not provide an ADR enforcement mechanism while preventing parties "from obtaining the very information necessary to" invoke it. *Astra*, 563 U.S. at 121. Laws are often "drawn not only to bar what they prohibit but to allow what they permit." *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000). By prohibiting offer conditions that federal law permits, H.B. 1473 upsets the balance that Congress struck.

***Second***, Subsection (b)(5) bans the use of rebates to provide the 340B discount. N.D. Cent. Code § 43-15.3-08(3)(b)(5). That prohibition flouts federal law: HRSA has approved an updated 340B pilot program that "provides a rebate mechanism through which qualifying [drug] manufacturers may effectuate the 340B ceiling price" beginning January 1, 2027. 91 Fed. Reg. at 48,883. "The exponential growth of the 340B Program," HRSA observed, has "strained the capacity of audit-based approaches." *Id.* at 48,901. H.B. 1473's ban on rebates—together with its ban on claims data, at least some of which is "necessary to effectuate rebate payments and support 340B program integrity and nonduplication," *id.* at 48,896—contradicts the federal program.

***Third***, H.B. 1473 imposes ***criminal*** penalties. *See* N.D. Cent. Code §§ 43-15.3-08(3)(b), 54-12-01(2), 54-12-02. This further disrupts the balance of 340B enforcement mechanisms. Because North Dakota's penalties are more severe than the federal government's, they "undermine[] the congressional calibration of force." *Crosby*, 530 U.S. at 380. The distortive nature of H.B. 1473's enforcement mechanism is especially evident in the rebate pilot context. H.B. 1473 purports to *criminalize* 340B rebates by requiring that discounts under the 340B Program be given "at the time of sale" and forbidding manufacturers from conditioning 340B offers on claims data that is not "required" by federal law. N.D. Cent. Code § 43-15.3-08(3)(b)(3), (5). Yet HRSA's pilot program *invites* manufacturers to use rebates—and insists on the collection of claims data while they do so. 91 Fed. Reg. at 48,901. The criminal nature of the state enforcement mechanism discourages manufacturers from participating in the federal pilot program if they are unsure whether it would violate state law. North Dakota's heavy-handed interference with federal discretion is preempted. *See Forest Park II*, 336 F.3d at 731-32 (state law "interfere[d] with the implementation of a federal program by a federal agency").

***Fourth***, even H.B. 1473's provisions prohibiting single-contract-pharmacy conditions, N.D. Cent. Code § 43-15.3-08(3)(b)(1)-(2), (4), are distinct from those examined in *McClain* and *Hanaway*. This Court construed the Arkansas and Missouri laws in *McClain* and *Hanaway* to regulate "only the delivery of 340B drugs," without intruding into the subject matter of the 340B Program. *Hanaway*, 180 F.4th at 1107; *McClain*, 95 F.4th at 1144. The Fifth Circuit did the same in *AbbVie, Inc. v. Murrill*, 180 F.4th 747, 759 (5th Cir. 2026).

Here, by contrast, North Dakota *concedes* that H.B. 1473 targets and interferes with manufacturers' pre-sale 340B offers, the contents of which are governed by Section 340B and PPAs with the Federal Government. *E.g.*, R. Doc. 31-1 at 44 (North Dakota conceding that H.B. 1473 "can only plausibly refer to pre-sale conditions"); Add. 4, 17-18; App. 1330, 1343-44; R. Doc. 83, at 4, 17-18 (H.B. 1473 "directly alters manufacturer conditions" (quoting the State)). H.B. 1473 thus purports to impose "additional requirements" on 340B offers beyond the federal government's, *Forest Park II*, 336 F.3d at 730, in ways this Court held were not at issue in *McClain* and *Hanaway*. H.B. 1473's attempt to prohibit offer conditions that Congress allowed is uniquely pernicious.

*See Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614 (1986) (explaining that federal law "precludes state and municipal regulation concerning conduct that Congress intended to be unregulated" (cleaned up)); *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 10 (1st Cir. 2022) (state law cannot "nullify [an] implicit federal right" granted to private parties). Section 340B preempts it. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).

***Fifth***, no presumption against preemption changes the foregoing analysis. *Contra* Br. 37-38. The presumption is inapplicable because H.B. 1473 is not a generally applicable state law operating in a traditional area of state regulation. Add. 19; App. 1345; R. Doc. 83, at 19; *see McCuskey*, 171 F.4th at 688-89 (analogous state law is "anything but a traditional health-and-safety regulation"); *Drummond*, 808 F. Supp. 3d at 1273 (analogous state law "expands drug manufacturer's obligations under the federal 340B program" and nothing else). H.B. 1473 targets the federal 340B Program for regulation, *supra*, at 29-30; it does not operate in a traditional area of state regulation by adopting generally applicable health and safety rules, such as rules requiring locked drug containers, delivery-vehicle inspections, or pharmacy identification.

H.B. 1473 exclusively regulates 340B offers under federal law, which are based on the PPA relationship between drug manufacturers and the Federal Government. *Supra*, at 2-3. This "relationship between a federal agency and the entity it regulates is inherently federal," foreclosing the "presumption against pre-emption." *Buckman*, 531 U.S. at 347-48. Put another way, the presumption does not apply where a state requirement "exist[s] solely by virtue of the [federal] requirements" it purports to regulate. *Buckman*, 531 U.S. at 353; *accord DiCroce v. McNeil Nutritionals, LLC*, 82 F.4th 35, 41 (1st Cir. 2023) (state law improper unless the unlawful conduct "would also violate [state law] even if the [federal law] did not exist" (citation omitted)).

## II. H.B. 1473 Effects Unconstitutional Takings.

H.B. 1473 also violates the Takings Clause because it compels discounted sales of drugs under terms AbbVie would never voluntarily accept—and that the 340B Program does not require—for the benefit of private parties. This kind of law has never been constitutional. U.S. Const. amend. V; *Calder v. Bull*, 3 U.S. 386, 388 (1798); *Kelo v. City of New London*, 545 U.S. 469, 477 (2005). Unsurprisingly, multiple courts have concluded that laws like H.B. 1473 effect unconstitutional takings.

*See Drummond*, 808 F. Supp. 3d at 1279-80; *AbbVie v. Brown*, 809 F. Supp. 3d 1341, 1360-62 (D. Utah 2025); *AstraZeneca Pharms. LP v. McClain*, 2025 WL 4092197, at *8 (E.D. Ark. Sept. 30, 2025).

The district court did not reach AbbVie's Takings Clause claim, but AbbVie pressed that claim below. R. Doc. 29 at 30-36; R. Doc. 48 at 16-22; *see also* Tr. of March 26, 2026 Hearing, at 168:3-169:14. The evidence supports the conclusion that H.B. 1473 takes AbbVie's property without compensation. This Court may affirm the judgment below on that basis.

### A. H.B. 1473 Effectuates Physical Takings By Compelling Unconditional Discounted Sales.

"When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-48 (2021). "Government action that physically appropriates property is no less a physical taking because it arises from a regulation." *Id.* at 149. The essential question is "whether the government has physically taken property for itself or someone else—by whatever means—or has instead [merely] restricted a property owner's ability to use his own property." *Id.* Whenever a law "results in a

physical appropriation of property, a per se taking has occurred"—and the "government must pay for what it takes." *Id.* at 148-49.

North Dakota's law works a physical taking because it forces AbbVie to physically transfer its property—drugs covered under the 340B Program—in circumstances when AbbVie would otherwise decline a sale. H.B. 1473 makes it unlawful to "[d]irectly or indirectly deny, restrict, prohibit, or otherwise interfere with *the acquisition of a drug* by a contract pharmacy on behalf of a covered entity." N.D. Cent. Code § 43-15.3-08(3)(b)(1) (emphasis added); *see also id.* § 43-15.3-08(3)(b)(2)-(5) (preventing AbbVie from enforcing other conditions on the sale of drugs at the 340B price). Because a "drug" under North Dakota's scheme is defined as a drug sold at the steeply discounted 340B price, *id.* § 43-15.3-08(3)(a)(3), H.B. 1473 forces AbbVie to physically part with its products at the 340B price when AbbVie would not otherwise do so.

AbbVie never agreed to these uncompensated transfers of property when it entered into the PPA with the Federal Government. Federal law does *not* require AbbVie to accommodate unlimited contract-pharmacy orders for 340B-priced drugs or to waive its other contract-pharmacy conditions. To the contrary, Section 340B "preserves" AbbVie's ability to

place conditions on its 340B-priced offers and decline sales where those conditions are not agreed to. *Novartis*, 102 F.4th at 460; *cf. Horne v. Dep't of Agric.*, 576 U.S. 350, 364 (2015) (property owners have a Fifth Amendment "right to control [the] disposition" of their property). Absent H.B. 1473, AbbVie would enforce its contract-pharmacy policy: If a covered entity does not accept those conditions, no 340B-priced sale takes place. *See* App. 1006-07; R. Doc. 28-18 ¶¶ 6-7. But under H.B. 1473, AbbVie must unconditionally sell—and thus physically transfer—its drugs at 340B prices, even when a covered entity does not agree to AbbVie's terms. The entire purpose and effect of H.B. 1473 is to increase the volume of 340B-priced drugs sold, thus compelling (steeply discounted) sales that would not otherwise occur. Whenever H.B. 1473 forces AbbVie to complete a 340B-priced sale it would otherwise decline, North Dakota has committed a physical taking. *Cedar Point*, 594 U.S. at 147-49; *see also Horne*, 576 U.S. at 362.

The Supreme Court's decision in *Horne* is directly on point. *Horne* involved a federal regulation that required raisin farmers to set aside a percentage of their crop for disposition by a federal agency. Though the farmers retained an interest in residual proceeds from sales of the

raisins, they lost "any right to control their disposition." *Horne*, 576 U.S. at 364. The Court held that this was a "clear physical taking," because the farmers lost "actual … possession and control" of the raisins. *Id.* at 360-62 (citation omitted). So too here. H.B. 1473 compels AbbVie to physically transfer possession and control of its drugs in circumstances when AbbVie would otherwise decline the sale, depriving AbbVie of its physical property and removing its ability to control the sale of its drugs, a *per se* physical taking. *See Cedar Point*, 594 U.S. at 147; *Horne*, 576 U.S. at 362.

The State's effort to recharacterize its law as "a negative obligation of non-interference" is wholly unpersuasive. *Cf.* Br. 48. Virtually any law accomplishing an uncompensated physical taking could be phrased using language of non-interference. For example, a state law providing, "Auto dealers must unconditionally sell cars for $10" would be functionally the same as a state law that read, "Auto dealers may not deny or interfere with the acquisition of a car for $10." Both laws accomplish uncompensated physical takings because they compel auto dealers to unconditionally part with cars for $10, rather than selling at the market price or declining an unconditional sale.

In the same way, H.B. 1473 compels AbbVie to physically part with its property by eliminating its ability to decline unconditional sales of drugs at 340B prices and thus forcing new sales—a per se physical taking. *See Cedar Point*, 594 U.S. at 147. AbbVie estimates it will lose tens of millions of dollars annually because of the additional 340B-priced sales H.B. 1473 compels. App. 1247; R. Doc. 75 ¶ 9. By forcing AbbVie to make sales that AbbVie, in full compliance with federal law, would not otherwise make, H.B. 1473 physically appropriates AbbVie's property without providing compensation.

North Dakota cannot avoid this result by arguing that AbbVie voluntarily agreed to participate in the 340B Program. The only potentially voluntary 340B obligations AbbVie has ever undertaken are those set forth in the contract AbbVie signed *with the Federal Government*. AbbVie signed that PPA because it must do so to participate in Medicaid and Medicare Part B. *See* 42 U.S.C. § 1396r-8(a)(1). And the terms of the PPA are set by Congress in the 340B statute. *See id.* § 256b(a); *Astra*, 563 U.S. at 118. Neither § 256b, nor § 1396r-8, nor the PPA itself requires compliance with additional state-law restrictions on the 340B offer or condones state-law attempts to add them. It is thus

impossible that North Dakota's law is among the "unambiguous[]" terms that AbbVie "voluntarily and knowingly accept[ed]" when it signed its PPA. *Barnes*, 536 U.S. at 186.

Unlike the PPA—which grants AbbVie access to Medicaid and Medicare Part B—H.B. 1473 confers no benefit on AbbVie. It does not, for example, "charg[e] admission to a market of [North Dakota's] own creation, but rather … demand[s] a ransom in exchange for continued access to [the federal] market." *Drummond*, 808 F. Supp. 3d at 1279. States cannot "rid[e] the coattails of a federal benefit" in this way. *Brown*, 809 F. Supp. 3d at 1362. North Dakota has not provided any "exchange of value" for those new exactions "because [North Dakota] isn't giving [AbbVie] anything [it does not] already have (*i.e.*, access to the federal market)." *Drummond*, 808 F. Supp. 3d at 1279. That makes H.B. 1473 an involuntary and uncompensated physical taking. *Id.*; *see also Va. Hosp. & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633, 666 (E.D. Va. 2023) (concluding that "***state law*** [certificate] requirements have no bearing on whether providers' participation in Medicaid and Medicare is voluntary as a matter of ***federal*** law").

*Valancourt Books, LLC v. Garland*, 82 F.4th 1222 (D.C. Cir. 2023) is instructive. There, the D.C. Circuit addressed Section 407 of the Copyright Act, which required copyright holders to transfer free copies of their work to the government. *Id.* at 1227. The coerced transfers of free materials were uncompensated takings with no "voluntary exchange" that might save the section. In contrast to other sections that provided further rights, copyright holders did not need to transfer their works under Section 407 to receive the benefit of their copyright. This meant they "receive[d] no additional benefit for the works they forfeit[ed] [under the law]." *Id.* at 1232. Section 407 was therefore an uncompensated and involuntary taking.

Likewise, AbbVie is already entitled to participate in Medicaid and Medicare Part B. *See Drummond*, 808 F. Supp. 3d at 1279. So like the *Valancourt Books* copyright holders, AbbVie receives no new benefit from North Dakota to account for the new 340B-priced sales that H.B. 1473 compels. H.B. 1473 thus accomplishes an involuntary, uncompensated taking each time it forbids AbbVie from declining a 340B-priced sale under federal law.

### B. North Dakota's Takings Are Not For Public Use.

H.B. 1473's takings fail for the additional reason that they are not for "public use." *See* U.S. Const. amend. V (requiring that seized property be put to a "public use"). The Supreme Court has consistently forbidden takings that simply "confer[] a private benefit on a particular private party" or "benefit a particular class of identifiable individuals." *See Kelo*, 545 U.S. at 477-78; *see also, e.g.*, *Calder*, 3 U.S. at 388. North Dakota's law does just that: It forces AbbVie to sell its drugs at steeply discounted, confiscatory prices to private entities, so that those private entities can resell AbbVie's drugs at full price and reap the windfall.

H.B. 1473 does not require covered entities or pharmacies to share their windfalls with patients, and few of them do. *See* App. 0649-50; R. Doc. 28-12, at 6-7; App. 95-96; R. Doc. 28-2, at 2-3. In fact, North Dakota covered entities and commercial pharmacies have targeted their efforts to obtain 340B-priced drugs to serve customers who are more likely to be insured or otherwise have the means to pay for full-priced medications. As the district court found, "pharmacies and third-party administrators pocket billions of dollars each year." Add. 4; App. 1330; R. Doc. 83, at 4.

That private windfall serves no public use and violates the limitations imposed by the Takings Clause. *See Kelo*, 545 U.S. at 477; *Drummond*, 808 F. Supp. 3d at 1280 (enjoining Oklahoma's law as a "transfer of property adopted, to some extent, to benefit a particular class of identifiable individuals" (citation modified)); *Brown*, 809 F. Supp. 3d at 1361. After all, "[n]o amount of compensation" can cure the constitutional harm inflicted by a taking for ***private*** use. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005). This Court may affirm on the ground that H.B. 1473 effects an unconstitutional private taking.

## III. H.B. 1473 Violates Dormant Commerce Clause Principles.

The Commerce Clause "prohibits state laws that unduly restrict interstate commerce." *Ass'n for Accessible Meds.*, 140 F.4th at 960. Three types of laws violate the prohibition: Those that "(1) clearly discriminat[e] against interstate commerce in favor of in-state commerce, (2) impos[e] a burden on interstate commerce that outweighs any benefits received, or (3) ha[ve] the practical effect of extraterritorial control on interstate commerce." *Id.* The district court enjoined H.B. 1473 on the third basis, and the law fits the other two categories as well. *See* Add. 23-24; App. 1349-50; R. Doc. 83, at 23-24. *Hanaway* is not to the contrary,

*see Hanaway*, 180 F.4th at 1107-11, because the Missouri law at issue there differed from North Dakota's.[10]

H.B. 1473 violates dormant Commerce Clause principles in at least three ways.

***First***, H.B. 1473 impermissibly exercises extraterritorial control over out-of-state transactions. AbbVie is not located in North Dakota and sells drugs in the first instance to out-of-state wholesalers. Add. 24; App. 1350; R. Doc. 83, at 24. Thus, H.B. 1473 "in reality regulates the transactions between the manufacturers and out-of-state wholesalers," even when they occur entirely outside the state of North Dakota. *Id.* In such a scheme, "a Colorado manufacturer would be penalized" if it refused to sell "drugs to a New Jersey distributor" because a North Dakota covered entity declined to accept the manufacturer's terms of sale. *See Ass'n for Accessible Meds.*, 140 F.4th at 961.

So H.B. 1473 compels manufacturers to sell discounted drugs on North Dakota's terms when those drugs may end up, as a result of subsequent transactions, in North Dakota. But North Dakota cannot

---

[10] To the extent this Court concludes that *Hanaway* controls here, AbbVie respectfully submits that *Hanaway* was incorrectly decided.

seek the "specific extraterritorial effect of controlling the price of wholly out-of-state transactions." *Id.*; *see also Entergy Ark., LLC v. Webb*, 122 F.4th 705, 711 (8th Cir. 2024). To the extent *Hanaway* suggests otherwise, its reasoning rests on the premise that Missouri's law concerned only delivery. *See Hanaway*, 180 F.4th at 1108. As AbbVie and the district court explained, North Dakota's law is no mere delivery regulation. *See supra*, at 49-50.

***Second***, H.B. 1473 "clearly discriminat[es] against interstate commerce in favor of in-state commerce." *Ass'n for Accessible Meds.*, 140 F.4th at 960. Absent H.B. 1473, AbbVie's contract-pharmacy policy would mean that AbbVie conducts fewer sales at the 340B-discounted price, because some purchasers would rather pay full price or forgo AbbVie's drugs than agree to the conditions attached to its offers. *See* App. 1018; R. Doc. 28-18 ¶ 33. But H.B. 1473 ensures that AbbVie cannot refuse unfavorable counteroffers at the 340B price, as it can in other states. *See Novartis*, 102 F.4th at 460. So covered entities in North Dakota can buy more discounted drugs than similarly situated out-of-state entities—because they need not accept the conditions those entities must. *See* App. 1018; R. Doc. 28-18 ¶ 32; App. 1247; R. Doc. 75 ¶ 9. Such

raw protectionism, in which North Dakota "build[s] up ... domestic commerce" at the expense of other states, violates core dormant Commerce Clause principles. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)).

***Third***, H.B. 1473 imposes a significant interstate burden that outweighs any purported in-state benefit. *Ass'n for Accessible Meds.*, 140 F.4th at 960. AbbVie suffered "approximately $10 million" in compliance costs from "July 1, 2025 through December 31, 2025," with "another $35 million" in compliance costs expected in 2026. App. 1247; R. Doc. 75 ¶ 9. In exchange, H.B. 1473's "benefits" accrue to "hospital conglomerates" and "the balance sheet of in-state entities." Add. 5; App. 1331; R. Doc. 83, at 5. Individual North Dakotans scarcely benefit. App. 1001; R. Doc. 28-17 ¶ 44 (estimating that "less than 5 percent (perhaps less than 2 or 3 percent)" of 340B transactions "involve any sort of direct patient discount"). Those purported benefits for in-state economic interests cannot outweigh the substantial burden H.B. 1473 places on interstate commerce. *Hanaway* did not purport to hold to the contrary; it addressed a different, more limited preliminary-injunction-stage record, and limited its holding to that "stage" of the proceedings. *See Hanaway*, 180

F.4th at 1110-11 ("[T]he evil [plaintiff] perceives is ***only*** that it must now contend with a patchwork of state laws." (emphasis added).

## CONCLUSION

AbbVie respectfully asks that this Court affirm the district court's judgment.

DATED: August 18, 2026

Respectfully submitted,

*/s/ Matthew S. Owen*

MATTHEW S. OWEN
RUSSELL B. BALIKIAN
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500
mowen@gibsondunn.com
rbalikian@gibsondunn.com

Meredith M. Pohl
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 900
Washington, DC 20006
(202) 737-0500
mpohl@kslaw.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because it contains 12,506 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief also complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook font 14-point type face.

Pursuant to Eighth Circuit Rule 28A(h)(2), I further certify that this brief has been scanned for viruses using a commercial virus scanning program, which reports the brief to be virus free.

*/s/ Matthew S. Owen*
Matthew S. Owen

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Matthew S. Owen*
Matthew S. Owen